IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANNY R. GREEN

v.                                                    C.A. NO. 13-3962

DELPHI FINANCIAL GROUP, INC. and
RELIANCE STANDARD LIFE INSURANCE
COMPANY

MEMORANDUM OPINION

SCHMEHL, J.                                           JULY 16, 2014

      Plaintiff has filed an Amended Complaint, alleging that defendant Delphi Financial Group, Inc. ("Delphi") breached the terms of an employee incentive plan by refusing to compensate plaintiff for his restricted shares and options in shares of Delphi Class A stock following Delphi's merger with another company (Count I). Plaintiff has also asserted claims against defendant Reliance Standard Life Insurance Company ("Reliance") for promissory estoppel (Count II), equitable estoppel (Count III), and unjust enrichment (Count IV), a claim against Delphi and Reliance for violation of the Pennsylvania Wage Payment and Collection Law, Pa. Stat. tit. 43 § 260.1 *et seq.* ("WPCL") (Count V) and a claim against Delphi for violation of General Corporation Law of Delaware, Del. Code tit. 8 § 101 *et seq.* (Count VI). Presently before the court is the motion of the plaintiff for partial summary judgment and the motion of the defendants for summary judgment. For the reasons that follow, the plaintiff's motion is denied and the defendants' motion is granted.

**STANDARD OF REVIEW**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J. , 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

**FACTS**

The parties have stipulated to the following facts:

1. [Plaintiff] was an executive at Reliance, a wholly-owned subsidiary of Delphi for 12 years.

2

2. By the time he left his employment at Reliance in June 2012, [plaintiff] was Reliance's Senior Vice President of Underwriting.

3. The 2003 Employee Long-Term Incentive and Share Award Plan (the "Plan") was duly adopted by Delphi's Board of Directors and approved by Delphi's shareholders.

4. The Plan has never been amended, altered, suspended, discontinued, or terminated.

5. [Plaintiff] was the recipient of several awards under the Plan, including an award dated December 29, 2010 (the "2010 Award Agreement").

6. The 2010 Award Agreement was issued pursuant to the Plan. [The 2010 Award Agreement granted plaintiff 25,854 Restricted Delphi Class A shares (the "restricted shares") and 60,000 options to purchase Delphi Class A shares at a strike price of $24.91 (the "options"), subject to various conditions (Award Agr. at 1.)]

7. The December 21, 2011 Agreement and Plan of Merger ("Merger Agreement") between Delphi and Tokio Marine Holdings, Inc. and TM Investment (Delaware), Inc. (collectively, "Tokio") was duly executed by the parties thereto.

8. The Delphi-Tokio merger became effective on May 15, 2012.

9. The Delphi-Tokio merger was a Change of Ownership within the meaning of Section 8(b) of the Plan.

10. By virtue of how Tokio and Delphi structured the transaction, there were no shares of Delphi Class A stock after May 15, 2012.

11. [Plaintiff] received payment of a $1.00 per share Special Dividend on each of his 25,854 restricted shares when the merger became effective.

12. Since he left Reliance's employ, [plaintiff] has not received any payment in

3

connection with the 2010 Award.

13. $19.965 is the difference between the strike price ($24.91) of [plaintiff's] options and the sum of the share price ($43.875) and the $1.00 per share Special Dividend paid by Tokio pursuant to the terms of the Merger Agreement.

14. Exhibit D to the parties' Joint Statement of Undisputed Facts is a chart of Delphi's historical share price for the period November 2, 2009 to December 30, 2011, which is a matter of public record and can be found at numerous places, including Google Finance... [According to the website, the day before the Merger Agreement was announced Delphi stock was trading at $25.43 per share, making plaintiff's options worth $31,200.00 and his restricted shares worth $665,223.00 for a total of $696,423.00. Under the terms of the Merger Agreement, the plaintiff would receive $43.875 per share (less the strike price in the case of the options), plus a special dividend of $1.00 per share. Thus, under the Merger Agreement, plaintiff's options became worth $1,197,900.00 and his restricted shares worth became worth $ 1,134,344.00, for a total of $2,332,244.00, which represented a 335% increase over the pre-merger value.]

15. Both the Plan and the 2010 Award were drafted by Delphi's employees or legal counsel, without any involvement by [plaintiff].

16. [Plaintiff] gave notice of his intent to resign from Reliance in February, 2012.

17. [Plaintiff's] last day of employment with Reliance was June 14, 2012.

18. [Plaintiff] terminated his employment voluntarily and without Good Reason, as that term is defined by the Award Agreement.

(Doc. 39-1.)

4

## DISCUSSION

### a. Breach of contract claim against Delphi

Plaintiff claims that Delphi breached the 2010 Award Agreement by refusing to pay

plaintiff the restricted shares and options to which he claims he is entitled under the 2010 Award

Agreement. Delphi argues that it is entitled to summary judgment on plaintiff's breach of

contract claim, claiming plaintiff forfeited his award when he voluntarily terminated his

employment before fulfilling what Delphi contends were time-based vesting requirements

contained within the 2010 Award Agreement and modified by the Merger Agreement.

Plaintiff argues, on the other hand, that, pursuant to Section 8(a) of the Plan, his award

immediately vested upon the effective date of the merger (May 15, 2012) while he was still

employed by Reliance and, as a result, he did not have to fulfill any time-based requirements

contained in the 2010 Award Agreement and the Merger Agreement.

Resolution of the dispute requires the court to analyze, interpret and reconcile the

applicable sections of the Plan, Award Agreement and Merger Agreement. A court must read

contract language in a way that allows all the language to be read together, reconciling conflicts

in the language if possible. CTF Hotel Holdings , Inc. v. Marriott Int'l, Inc., 381 F.3d 131, 137

(3d Cir. 2004). After reviewing the four corners of each of these documents, the court concludes

that Delphi is correct.[1]

The court begins with the pertinent language of the Plan. The Plan specifically authorized

---

[1] Because the court finds these documents to be clear and unambiguous, it declines the plaintiff's invitation to consider extrinsic evidence in the form of prior Awards granted by Delphi to plaintiff. The court notes that, under Pennsylvania law, "a contract is not rendered ambiguous by the mere fact that the parties disagree upon the proper construction." Metzger v. Clifford Realty Corporation, 476 A.2d 1, 5 (Pa.Super. 1984).

Delphi's Compensation Committee (the "Committee") to issue employee "Awards" comprised of

restricted shares and/or options in order to "attract, retain, and motivate employees of the

Company and its Subsidiaries." (Plan §§ 1-3.) The Plan further provided that any Awards issued

thereunder would be exercisable for so long as the participant was employed and that unvested

awards existing at employment termination would be forfeited. (Id. at §§ 5(b)(ii), (iii) (options),

5(c)(ii)) (restricted shares.)

      In addition, Section 9(d) of the Plan provides:

> **(d) <u>Changes to the Plan and Awards.</u>** The Board may amend, alter, suspend,
> discontinue, or terminate the Plan of the Committee's authority to grant Awards
> under the Plan without the consent of shareholders of the Company or
> Participants; <u>provided, however</u>, that any such amendment, alteration, suspension,
> discontinuance or termination shall be subject to the approval of the Company's
> shareholders. . . .Notwithstanding the foregoing, without the consent of an
> affected Participant, no amendment, alteration, suspension, discontinuation, or
> termination of the Plan may materially and adversely affect the rights of such
> Participant under any Award theretofore granted to him or her. The Committee
> may waive any conditions or rights under, amend any terms of, or amend, alter,
> suspend, discontinue or terminate, any Award theretofore granted, prospectively
> or retrospectively; <u>provided, however</u>, that, without the consent of a Participant,
> no amendment, alteration, suspension, discontinuation or termination of any
> Award may materially and adversely affect the rights of such Participant under
> any Award theretofore granted to him or her.

(Id. at §9(d).)

      In the event of a merger, Section 4(c) of the Plan provides that "the Committee is

authorized to make adjustments in the terms and conditions of, and the criteria and performance

objectives, if any, included in, Awards in recognition of unusual or non-recurring events

(including, without limitation events described in the preceding section [reorganization, merger,

consolidation, combination, spin-off, combination, repurchase, or share exchange] affecting the

Company or any Subsidiary ..." (Id. at § 4(c).) Thus, Section 4(c) of the Plan specifically

authorizes the Committee to make adjustments to an Award in recognition of an unusual or non-

recurring event such as a merger. Unlike Section 9(d), Section 4(c) of the Plan contains no

requirement that Participant consent  must be obtained.

Meanwhile, the 2010 Award Agreement provided for vesting of plaintiff's restricted

share and options, but only if two conditions were met. First, Reliance had to achieve a specified

operating income target for the 2009-2012 period (the "Performance Period"). (Award Agr. at 2.)

Second, the plaintiff had to remain employed through the end of the Performance Period.

(December 31, 2012). (Id.) The 2010 Award Agreement specifically provided that if the plaintiff

terminated his employment with Reliance during the Performance Period other than for Good

Reason, death or disability, the Restricted Shares would be forfeited in their entirety, effective

immediately upon such termination." (Id. at 4.)  Similarly, the 2010 Award Agreement

incorporated the Plan provision providing that "[a]ny portion of the Option which was not

exercisable on. . . the last day [of employment] shall expire immediately." (Plan § 5(b)(iii),

incorporated by the Award Agr. at 4-5.) (the "Options are in all respects subject to each of the

terms and conditions of the Plan.")

The 2010 Award Agreement further provided that if Reliance terminated plaintiff's

employment without Cause or if plaintiff terminated his employment for Good Reason

subsequent to a Change of Ownership, the options and restricted shares would immediately vest.

(Id. at 5.) Specifically, the first full paragraph on Page 5 of the 2010 Award Agreement (the

"Page 5 Paragraph") provides that:

7

[I]f RSL terminates your employment without Cause or if you terminate your employment for Good Reason (as such term is defined above), in either case subsequent to the occurrence of a Change of Ownership, and, as of the date of such termination (the "Termination Date"), the Options then remain outstanding but have not been exercisable. . . and the Restricted Shares then remain outstanding, subject to the Restrictions, then, so long as the Performance Condition has been satisfied as of the Termination Date, such Options shall immediately become exercisable in their entirety and the Restrictions shall immediately lapse in their entirety as to such Restricted Shares.

(Id.).

The parties have stipulated that the merger was a Change of Ownership. (Doc. 39-1 at ¶ 9.) Reliance did not terminate plaintiff's employment without cause. The parties stipulated that plaintiff terminated his employment voluntarily and without Good Reason. (Doc. 39-1 at ¶ 18.) Therefore, under the unambiguous terms of the Page 5 Paragraph of the 2010 Award Agreement, plaintiff's Options and Restricted Shares did not qualify for accelerated vesting.

The Merger Agreement also contained a specific provision addressing the effect of the merger on a Participant's Restricted Shares and Options. Specifically, Section 4.3(d) provided:

(d)     Treatment of Performance-based Restricted Shares and Options. At the Effective Time, the performance-based vesting conditions in respect of each outstanding Restricted Share and Class A Option, the vesting of which is conditioned on the achievement of certain performance criteria in respect of the Company Subsidiaries (collectively, the "Performance Awards" and individually, the "Performance Shares" and the "Performance Options"), shall be deemed satisfied, but the time-based vesting conditions in respect of the Performance Awards shall not be deemed satisfied at the Effective Time. [emphasis added] At the Effective Time, each outstanding Performance Share shall automatically be converted into a right to receive an amount in cash equal to the Class A Per Share Merger Consideration, which will vest and be paid to holders, thereof on March 5, 2013, subject to continued employment with Parent and its Affiliates ....through March 5, 2013 [emphasis added], and will otherwise retain the same terms and conditions (including, in the event of certain terminations of employment, accelerated vesting and payment) as contained in the original Performance Shares

8

(but taking into account any changes to such Performance Shares that are necessary to reflect the provisions of this Section 4.3(d)). At the Effective Time, each outstanding Performance Option shall automatically be converted into a right to receive an amount in cash equal to the product (x) the total number of Class A shares subject to the Performance Option times (y) the excess of the Class A Equity Award Consideration over the exercise price per Class A Share under such Performance Option, which will vest and be paid to holders thereof on December 31, 2012, subject to continued employment with Parent and its Affiliates (including the Company and the Company Subsidiaries) through December 31, 2012. [emphasis added], and will otherwise retain the same terms and conditions (including, in the event of certain terminations of employment, accelerated vesting and payment) as contained in the original Performance Options (but, taking into account any changes to such Performance Options that are necessary to reflect the provisions of this Section 4.3(d)).

(Merger Agr. at § 4.3(d).)

Under the plain meaning of this language, "any performance-based vesting conditions" of Delphi's outstanding Awards were "deemed satisfied" as a result of the merger which meant that the income target requirement contained in the 2010 Award Agreement would no longer have to be satisfied in order for plaintiff's Award to vest. (Merger Agreement 4.3(d))

Section 4.3(d) of the Merger Agreement, however, maintained the requirement for continued employment. Specifically, the Merger Agreement stated that "the time-based vesting conditions in respect of the Performance Awards shall not be deemed satisfied." (Id.) The Merger Agreement further confirmed this by providing that the plaintiff's Options "will vest and be paid to holders thereof on December 31, 2012, subject to continued employment with Parent and its Affiliates through December 31, 2012" and "will otherwise retain the same terms and conditions (including, in the event of certain terminations of employment, accelerated vesting and payment) as contained in the original Performance Options . . . " (Id.) The Merger Agreement also provided that the Restricted Shares "will vest and be paid to holders thereof on March 5, 2013, subject to

9

continued employment with Parent and Affiliates through March 5, 2013" and " will otherwise

retain the same terms and conditions (including, in the event of certain terminations of

employment, accelerated vesting and payment) as contained in the original Performance Shares . ."

(Id.)

In short, as a result of Section 4.3(d) of the Merger Agreement, Reliance no longer had to

meet performance goals in order for plaintiff's Award to vest, but plaintiff still had to remain

additionally employed with Reliance [through December 31, 2012] in order for his Options to vest

and [through March 5, 2013] in order for his Restricted Shares to vest.

Since plaintiff resigned without Good Reason and his last day of employment was June 14,

2012, six months before his Options under the 2010 Award Agreement would vest and nearly nine

months before his Restricted Shares would vest, he did not satisfy Section 4.3(d) of the Merger

Agreement and his breach of contract claim must fail. This conclusion is perfectly logical and

reflects Delphi's need for its senior executives to stay for a short period of time after the merger to

drive financial performance and continue to run the company through their normal vesting period.

At the same time, Delphi provided protection to the senior executives in the form of accelerated

vesting in the event of an unjust termination (which did not occur here). Otherwise, any Reliance

senior executive could cash out and leave immediately after the Change of Ownership, leaving the

newly formed company with no experienced senior executives.

Plaintiff directs the court's attention to Section 8(a) of the Plan, and contends that, under

that Section, his options and shares vested immediately upon the Change of Ownership.  Section

8(a) of the Plan provides:

> Unless otherwise provided by the Committee at the time of the Award grant, in the
> event of a Change of Ownership, (i) all outstanding Awards pursuant to which the

10

Participant may have rights the exercise of which is restricted or limited, shall
become fully exercisable at the time of the Change of Ownership, and (ii) unless the
right to lapse of restrictions or limitations is waived or deferred by a Participant
prior to such lapse, all restrictions or limitations (including risks of forfeiture and
deferrals) on outstanding Awards subject to restrictions or limitations under the
Plan shall lapse, and all performance criteria and other conditions to payment of
Awards under which payments of cash Shares or other property are subject to
conditions shall be deemed to be achieved or fulfilled and shall be waived by the
Company at the time of the Change of Ownership.

Plan at §8(a) (emphasis added.)

Although Section 8(a) specifically states that any outstanding Awards subject to restrictions

such as plaintiff's Award "shall become fully exercisable at the time of the Change of

Ownership," this provision only applies "[u]nless otherwise provided by the Committee at the time

of the Award grant." (Id.)

In fact, the Committee did "otherwise provide[]" at the time of the 2010 Award Agreement

grant. The Page 5 Paragraph specifically set forth the set of conditions that needed to be met for

accelerated vesting to occur in connection with a Change of Ownership.

In short, the Committee provided that a Change of Ownership would immediately vest

plaintiff's Award only if (i) Reliance terminated the plaintiff's employment without Cause or the

plaintiff terminated his employment for Good Reason and (ii) the Performance Condition (as

defined in the Award) was satisfied. (Id.) Therefore, rather than leaving the 2010 Award

Agreement silent on the effect of a Change of Ownership on plaintiff's Award and permitting

section 8(a) of the Plan to apply, the Committee specifically "otherwise provided," and as such

rendered the remainder of Section 8(a) of the Plan inapplicable.[2] It is undisputed that plaintiff's

---

[2] Plaintiff's argument that Section 8(a) of the Plan always vests all outstanding Awards at
the *moment* of a Change of Ownership would render the Page 5 Paragraph and Section 4.3(d) of

11

employment was not terminated by Reliance without cause and that plaintiff did not terminate his employment for Good Reason. Therefore, plaintiff did not satisfy the first condition for accelerated vesting in the event of a Change of Ownership under the Page 5 Paragraph of the 2010 Award Agreement.[3]

Plaintiff also argues that the Merger Agreement did not and could not have amended his 2010 Award Agreement because the Merger Agreement amounted to a "material and adverse change" to the Award that required his consent under Section 9(d) of the Plan. According to plaintiff, the material and adverse change to plaintiff's Award is "because he lost the time value of over $2.3 million dollars, he lost the ability to make use of the money for 7-10 months, and, most, importantly, all of that money was at risk because Delphi could have experienced financial difficulties and failed to pay him in whole or in a timely manner, or Reliance could have simply terminated him prior to December 31, 2012 and claim that he wasn't owed a cent." (Doc. 42 at 14.)

Contrary to plaintiff's interpretation, were it not for the Merger Agreement, plaintiff might never have been eligible for over 2.3 million dollars in the first place. The Merger Agreement not only enhanced plaintiff's award by eliminating one of the vesting requirements----the income target

---

the Merger Agreement meaningless and superfluous since these provisions set forth the conditions for vesting *after* a Change of Ownership. Courts must avoid interpreting contracts in a manner which would render any one provision meaningless. CTF Hotel Holdings, supra.

[3] Plaintiff claims that the Page 5 Paragraph has no application to his situation because, according to its express terms, it applies only to terminations in which the options and the restricted shares "then remain outstanding." According to plaintiff, his options and shares did not remain outstanding after the merger and in fact ceased to exist after the merger. (Doc. 39-1 at ¶ 10, This distinction is of no import as the "then remain outstanding" language contained in the Page 5 Paragraph is not applicable to plaintiff since he did not satisfy either of the first two conditions of the Page 5 Paragraph, i.e. Reliance having terminating plaintiff's employment without cause or plaintiff having terminated his employment with Good Reason.

12

requirement, but also enhanced the award by significantly increasing the value of plaintiff's Options and Restricted Shares. The price of Delphi Class A stock the day before the merger was $25.43 a share while under the Merger Agreement, plaintiff would have received $43.875 per share (less the strike in the case of the options) plus a special dividend of $1.00 per share. Therefore, the Merger Agreement can hardly be said to have amounted to an adverse change to plaintiff's Award and therefore such a beneficial change did not require plaintiff's consent. In any event, as noted supra, it is not Section 9(d) of the Plan which is applicable, but rather Section 4(c) which governs the effects of a merger on a Participant's Award. That Section clearly does not require a Participant's consent.

In sum, under the Page 5 Paragraph of the Award Agreement and Section 4.3(d) of the Merger Agreement, which the court finds to be entirely consistent with each other, plaintiff was only entitled to accelerated vesting of his Restricted Shares and Options (without any time-based vesting requirements) if Reliance terminated the plaintiff's employment without cause or the plaintiff terminated his employment for Good Reason. Neither of these conditions occurred. Moreover, Section 8(a) of the Plan was rendered inapplicable by the Page 5 Paragraph by which the Committee "otherwise provided" in the event of a Change of Ownership on the Plan Award. Therefore, judgment will be entered in favor of Delphi on plaintiff's breach of contract claim.

**b. Remaining state law claims**

Plaintiff has also asserted claims against Reliance for promissory estoppel, equitable estoppel and unjust enrichment. Essentially, plaintiff's theory on these claims is that Reliance caused plaintiff to justifiably rely on the 2010 Award Agreement by continuing to work for Reliance and, as a result, Reliance cannot avoid its obligations under the 2010 Award Agreement.

13

It is well-settled, however, that the existence of an actual contract such as the 2010 Award

Agreement precludes equitable, quasi-contractual and unjust enrichment claims. See, e.g.,

Synesiou v. Designtomarket, Inc., C.A. 01-5358, 2002 WL 501494 at *4 (E.D.Pa. Apr. 3,

2002)("promissory estoppel has no application when parties have entered into an enforceable

agreement"); AmerisourceBergen Drug Corp. v. Allscripts Healthcare, LLC, C.A. No. 10-6087,

2011 WL 3241356 (E.D.Pa. July 29, 2011)(dismissing unjust enrichment claim because "neither

party contests the validity of the [contract], and any recovery would be determined on the basis of

that contract alone, precluding an unjust enrichment claim.")

Plaintiff contends that these claims are not based on the 2010 Award Agreement (since

Reliance was not a party to that Agreement), but are based on plaintiff's allegation in the Amended

Complaint that "[i]n 2009, Lawrence Daurelle, President of Reliance indicated that he could secure

for [plaintiff] a Stock Option Award Agreement with Delphi." (Am. Compl. ¶ 9.)  However, when

questioned about this allegation during his deposition, plaintiff testified:

> Q. Is that paragraph referring to a conversation?
>
> A. I–I–I'm not–I don't remember the conversation, specifically. And I don't want  to
>
> guess. But essentially the old award would have expired and we'd be negotiating a
>
> new set of awards for us.
>
>          * * *
>
> Q. Do you remember the conversation?
>
> A. Not specifically, no.

(Green Dep. at 104.)  As defendants point out, to the extent plaintiff recalled anything about the

conversation with Mr.Daurelle, his recollection was that Mr. Daurelle would not specifically secure

14

plaintiff an Award, but that Mr. Daurelle would try to secure an Award for all of Reliance's senior

executives:

> Q. But you don't recall the conversation specifically?
>
> A. Specifically no.
>
> Q. You don't remember exactly what was said?
>
> A. In the terms of a normal business day, it was, hey, when are we getting our new
> plan. Always called the plan.
>
> Q. You said, Hey when are we getting the new plan. And what's your sense of what
> he said back?
>
> A. *We're probably going to get one. Give it time....*

(Id. at 104-105.) (emphasis added.)

Based on this undisputed testimony, there is absolutely no evidence in the record of a

separate oral agreement by Mr. Daurelle to specifically secure an Award for plaintiff. As a result,

judgment will be entered on plaintiff's claims against Reliance for promissory estoppel, equitable

estoppel and unjust enrichment.

Plaintiff also asserts a claim against Delphi and Reliance under the WPCL. However, the

WPCL "does not create a right to compensation. Rather it provides a statutory remedy when the

employer breaches a contractual obligation to pay earned wages." Weldon v. Kraft, Inc. 896 F.2d

793, 801 (3d Cir. 1990). Because neither Reliance nor Delphi had an obligation to pay the plaintiff

for the 2010 Award (as the Award did not constitute wages), there was no breach that can support

the plaintiff's WPCL claim.

Finally, plaintiff has asserted a claim against Delphi for violation of Delaware General

15

Corporation Law. According to plaintiff, this is "a claim alleging disparate treatment of shareholders in connection with the Delphi-Tokio merger. The disparate treatment stems from the fact that shareholders who owned Delphi's Class A stock that was not restricted prior to the merger were paid for their shares at the time of the merger...,whereas those like Mr. Green, who held restricted shares of Delphi's Class A stock prior to the merger as the beneficial owner thereof with "the rights of a stockholder of Delphi"...did not." (Doc. 42 at 19-20.) Plaintiff contends that "once the restrictions on Mr. Green's restricted shares lapsed, he was just another holder of Class A Delphi stock and should have been paid as such." Id.

The problem with this argument is that the court has already concluded that the restrictions on plaintiff's shares did not lapse at the time of the merger, but remained in effect until March 5, 2013. As discussed above, the only way the restrictions would have lapsed at the time of the merger was if plaintiff was terminated by Reliance without cause or if plaintiff terminated his employment for Good Reason. Therefore, Delphi is entitled to judgment on this claim as well.

16